## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DENNIS DORLING, Derivatively on Behalf of Nominal Defendant MAXAR TECHNOLOGIES INC.,<br><br>        Plaintiff,<br><br>   v.<br><br>HOWARD L. LANCE, HOWELL M. ESTES III, NICK S. CYPRUS, JOANNE O. ISHAM, C. ROBERT KEHLER, L. ROGER MASON JR., ROBERT L. PHILLIPS, ERIC J. ZAHLER, DANIEL L. JABLONSKY, and ANIL WIRASEKARA,<br><br>        Defendants,<br><br>   and<br><br>MAXAR TECHNOLOGIES INC.,<br><br>        Nominal Defendant. | C.A. No. |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Dennis Dorling ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Maxar Technologies Inc. ("Maxar" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, gross mismanagement, and violations of Sections 10(b), 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Maxar with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports,

analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.  NATURE AND SUMMARY OF THE ACTION

1.  Maxar is a space technology company. Its subsidiary Space Systems/Loral ("SSL") in Palo Alto, California manufactures geostationary communications satellites ("GEO" or "GeoComm").  In October 2017, Maxar acquired DigitalGlobe, whose flagship imaging satellite is WorldView-4.

2.  Since 2014, the GeoComm business has declined as consumers opted for smaller, cheaper low-earth orbit ("LEO") communication technologies.  As a result, SSL won few awards, securing only two GEO orders in 2017.  Beginning March 2018, the Company and certain of its officers, though acknowledging that the GeoComm business declined, understated its negative impact on Maxar's financial results.

3.  On March 26, 2018, the Company announced a contract award to build a satellite called AMOS-8 for Israeli-based company Space Communication Ltd. ("Spacecom").  However, this was an illusory win because the contract was not effective until Spacecom made its initial payment and Spacecom could withdraw from the deal within 60 days without penalty.   Also, Spacecom relied on future bond offerings to fund the AMOS-8 project, and as investors learned through a series of  media articles, the Israeli government strongly favored an Israeli-owned company to build AMOS-8.  Still, the Company's public statements touted the AMOS-8 contract as a win.

4.  On August 7, 2018, Spruce Point Capital Management ("Spruce Point")  issued a report questioning Maxar's financial status and the Company's accounting practices.  Among other things, the report alleged that "Maxar's balance sheet is inflated with goodwill and overcapitalized

intangible assets" and estimated that Maxar's intangible assets were impaired by hundreds of millions of dollars.

5.      On this news, Maxar's share price fell $5.34, or over 13%, to close at $38.44 per share on August 7, 2018, on unusually heavy trading volume.

6.      Initially, Maxar dismissed the Spruce Point report as an attempt by short sellers to profit by manipulating the Company's stock price.  However, later that month, Maxar issued a comprehensive response, after an investigation by the Audit Committee, admitting that an asset impairment charge was necessary.

7.      On September 3, 2018, after Spacecom had failed to make its initial payment, shareholders learned that SSL had lost the AMOS-8 deal to an Israel-owned company.

8.      On this news, the Company's share price fell $1.71, or nearly 6%, to close at $29.34 per share on September 4, 2018, on unusually heavy trading volume.

9.      On or about October 12, 2018, data regarding the position and orientation of WorldView-4 indicated that the satellite had lost stability and could not produce high quality imagery.  However, this was not disclosed to the public, and Defendants touted the viability of WorldView-4.

10.      On October 31, 2018, the Company disclosed $345.9 million impairment losses and $37.7 million impairment charges ? related to the GeoComm business.

11.      On this news, the Company's share price fell $12.16, or nearly 45%, to close at $14.91 per share on October 31, 2018, on unusually heavy trading volume.

12.      On January 7, 2019, Maxar finally revealed that WorldView-4 "will no longer produce usable imagery" because it had lost stability.

13.     On this news, the Company's stock price fell $3.69, or over 31%, to close at $8.03 per share on January 7, 2019, on unusually heavy trading volume.  The next trading session, the stock price fell $2.00, or nearly 25%, to close at $6.03 per share on January 8, 2019, on unusually heavy trading volume.

14.     On February 28, 2019, Maxar reported a $162 million writedown for the loss of WorldView-4, $636 million impairment to goodwill, and $85 million in net impairment losses to GeoComm assets.

15.     These revelations precipitated the filing of a securities class action in the District of Colorado, captioned *Oregon Laborers Employers Pension Trust Fund v. Maxar Technologies Inc., et al.*, Case No. 1:19-cv-00124 (the "Securities Class Action").

16.     Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of nine members, eight of whom are named in this action.  As alleged herein, at least six directors allowed misleading statements to be disseminated: the three directors on the Company's Audit Committee failed to ensure the integrity of Maxar's internal controls, and three directors were familiar with WorldView-4's operation.  Thus, more than half the members would be interested in a  demand to investigate their own wrongdoing.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.     PARTIES

### Plaintiff

19.     Plaintiff Dennis Dorling purchased Maxar stock in January 2018 and has continuously owned his Maxar stock since that date.

### Nominal Defendant

20.     Nominal Defendant Maxar is a Delaware corporation with its principal executive offices located at 1300 W. 120th Avenue, Westminster, Colorado 80234.  The Company stock trades on the New York Stock Exchange under the symbol "MAXR."

### Defendants

21.     Defendant Howard L. Lance ("Lance") served as a director, President, Chief Executive Officer ("CEO") of the Company from May 2016 to January 2019.

22.     Defendant Howell M. Estes, III ("Estes") has served as the Company's Chairman of the Board of Directors since January 2019.  Estes served as a director of DigitalGlobe before it was acquired by Maxar.

23.     Defendant Nick S. Cyprus ("Cyprus") has served as a director of the Company since October 2017.  Cyprus is Chairman of the Audit Committee and a member of the Risk Committee.  He served as a director of DigitalGlobe before it was acquired by Maxar.

24.     Defendant Joanne O. Isham ("Isham") has served as a director of the Company since November 2016. She is a member of the Risk Committee.

25.     Defendant C. Robert Kehler ("Kehler") has served as a director of the Company since November 2016.  He is a member of the Risk Committee.

26.     Defendant L. Roger Mason Jr. ("Mason") has served as a director of the Company since October 2017.  He is a member of the Audit Committee.  He served as a director of DigitalGlobe before it was acquired by Maxar.

27.     Defendant Robert L. Phillips ("Phillips") has served as a director of the Company since October 2003.  He is a member of the Audit Committee.

28.     Defendant Eric J. Zahler ("Zahler") has served as a director of the Company since May 2014.

29.     Defendant Daniel L. Jablonsky ("Jablonsky") has served as President CEO of the Company since January 2019 and as a director of the Company since May 2019.  Jablonsky was President of DigitalGlobe from October 2017 to January 2019.

30.     Defendant Anil Wirasekara ("Wirasekara") served as the Company's interim Chief Financial Officer between February 26, 2018 and August 15, 2018.

31.     The defendants named in ¶¶21-30 are sometimes referred to hereinafter as the "Individual Defendants."  The defendants named in ¶¶21-29 are sometimes referred to hereinafter as the "Director Defendants."

**Relevant Non-Party**

32.     Defendant Roxanne Decyk ("Decyk") has served as a director of the Company since May 2019.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers, directors, and/or fiduciaries of Maxar and because of their ability to control the business and corporate affairs of Maxar, at all relevant times, the Individual Defendants owed Maxar and its shareholders fiduciary obligations of good faith,

loyalty, and candor, and were required to use their utmost ability to control and manage Maxar in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Maxar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Maxar and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Maxar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Maxar, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

35. To discharge their duties, the officers and directors of Maxar were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Maxar were required to, among other things:

    (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    (b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    (c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     RELEVANT BACKGROUND

### A.     Applicable Accounting Standards

36.     Until January 2019 when Maxar domesticated in the U.S., the Company's financial statements were subject to the International Financial Reporting Standards ("IFRS"). IFRS, which are promulgated by the International Accounting Standards Board ("IASB"), define the principles, conventions, and procedures that govern accepted international accounting. Certain standards adopted by IASB's predecessor remain in effect and are designated International Accounting Standards ("IAS").

### 1.     Impairment of Intangible Assets and Property, Plant, and Equipment ("PP&E") (IAS 36)

37.     IAS 36, *Impairment of Assets*, is used to ensure that a company's "assets are carried at no more than their recoverable amount." IAS 36.1. "An asset is carried at more than its recoverable amount if its carrying amount ['book value'] exceeds the amount to be recovered through use or sale of the asset ['fair value']. If this is the case, the asset is described as impaired and the Standard **requires** the entity to recognise an impairment loss."

38.     IAS 36.8 states that "[a]n asset is impaired when its carrying amount exceeds its recoverable amount." IAS 36.8. "An entity **shall** assess at the end of each reporting period whether there is **any** indication that an asset may be impaired." IAS 36.9. Moreover, if any indication is present that an impairment loss may have occurred, as set forth by the standards, "an entity is **required** to make a formal estimate of recoverable amount."

39.     At a minimum, an entity must consider the following indications described by IAS 36.12:

**External sources of information**

(a) there are observable indications that the asset's value has declined during the period significantly more than would be expected as a result of the passage of time or normal use.

(b) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal environment in which the entity operates or in the market to which an asset is dedicated.

*      *      *

**Internal sources of information**

(e) evidence is available of obsolescence or physical damage of an asset.

(f) significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used. These changes include the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs, plans to dispose of an asset before the previously expected date, and reassessing the useful life of an asset as finite rather than indefinite.

(g) evidence is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected.

40.     However, this list "is not exhaustive," and IAS 36.13 requires an entity to determine

an asset's recoverable amount if it identifies other indications that the asset may be impaired.

41.     Indicators based on internal reporting also include, as stated in IAS 36.14:

(a) cash flows for acquiring the asset, or subsequent cash needs for operating or maintaining it, that are significantly higher than those originally budgeted;

(b) actual net cash flows or operating profit or loss flowing from the asset that are significantly worse than those budgeted;

(c) a significant decline in budgeted net cash flows or operating profit, or a significant increase in budgeted loss, flowing from the asset; or

(d) operating losses or net cash outflows for the asset, when current period amounts are aggregated with budgeted amounts for the future.

42.     An asset's recoverable amount is the higher of its fair value less costs of disposal

(i.e. the fair value method) and of its "value in use" (i.e. the cash flow method). "Value in use" is

"the present value of the future cash flows expected to be derived from an asset or cash-generating unit."

43.     If it is not possible to estimate the recoverable amount of an individual asset, the entity should determine the recoverable amount "for the cash-generating unit [CGU] to which the assets belong."  IAS 36.22.  A CGU is "the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets and groups of assets."  IAS 36.6.

## 2.     IFRS: Impairment of Inventories (IAS 2)

44.     IAS 2, *Inventories*, is used for the accounting of inventory, including the requirement to take timely impairments.  Similar to IAS 36, these standards ensure that inventories are not carried in excess of amounts expected to be realised from their sale or use.

45.     According to IAS 2.6 and IAS 2.9, the value of an entity's inventories "***shall*** be measured at the lower of cost and net realisable value," where "net realisable value" is the "estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale."  "The cost of inventories ***shall*** comprise all costs of purchase, costs of conversion and other costs incurred in bringing the inventories to their present location and condition."  IAS 2.10.

46.     When calculating "net realisable value," IAS 2.28 states that "[t]he cost of inventories ***may not*** be recoverable if those inventories are damaged, if they have become wholly or partially obsolete, or if their selling prices have declined."  Moreover, events after the reporting period must be considered to confirm the conditions existing at the end of the reporting, as stated by IAS 2.30:

> Estimates of net realisable value are based on the most reliable evidence available at the time the estimates are made, of the amount the inventories are expected to realise. These estimates take into consideration fluctuations of price or cost directly

relating to events occurring after the end of the period to the extent that such events confirm conditions existing at the end of the period.

47.     Any writedown of inventories to net realizable value and all losses of inventories must be recognized as expenses in the period of the write-down or loss.  IAS 2.34.

### 3.     IFRS: Events After the Reporting Period (IAS 10)

48.     IAS 10, *Events after the Reporting Period*, prescribes "(a) when an entity should adjust its financial statements for events after the reporting period; and (b) the disclosures that an entity should give about the date when the financial statements were authorised for issue and about events after the reporting period."

49.     According to IAS 10.3, relevant events after the reporting period are:

those events, favourable and unfavourable, that occur between the end of the reporting period and the date when the financial statements are authorised for issue. Two types of events can be identified:

(a) those that provide evidence of conditions that existed at the end of the reporting period (adjusting events after the reporting period); and

(b) those that are indicative of conditions that arose after the reporting period (non-adjusting events after the reporting period).

50.     Specifically, evidence of impairments to assets and inventories can require adjustments to the current period financial statements, according to IAS 10.9:

The following are examples of adjusting events after the reporting period that require an entity to adjust the amounts recognised in its financial statements, or to recognise items that were not previously recognised:

*        *        *

(b) the receipt of information after the reporting period ***indicating that an asset was impaired at the end of the reporting period***, or that the amount of a previously recognised impairment loss for that asset needs to be adjusted.  For example:

*        *        *

(ii) the sale of inventories after the reporting period may give evidence about their net realisable value at the end of the reporting period.

51.     IAS 10.19 states that "[i]f an entity receives information after the reporting period about conditions that existed at the end of the reporting period, it ***shall*** update disclosures that relate to those conditions, in the light of the new information."

**B.     GeoComm Market and the DigitalGlobe Acquisition**

52.     Geostationary communication satellites are geosynchronous, i.e. their orbits match Earth's rotation, and appear stationary to an observer from Earth's surface, allowing them to relay radio, television, or Internet services to a fixed region of the world over many years.

53.     Each GEO award leads to hundreds of millions of dollars in revenue, but there is a slim profit margin because the manufacturing process is capital-intensive.  To stay afloat, the GeoComm business therefore requires a sufficient pipeline of orders and volume of production.

54.     In 2012, the Company bought SSL for $1.1 billion in cash, dividends, and other payments, acquiring approximately $300 million in PP&E and $320 million in intangible assets directly related to the GeoComm business.

55.     Over the next few years, SSL's GEO awards began to decline: SSL won nine GEO contracts in 2014 but only 5 in 2015 and 4 in 2016.  This decline was attributable to lower global demand: consumers shifted to Internet-based streaming services, which are supported by fiber optic connections and high-speed cellular networks rather than satellites, and the advent of smaller and more flexible LEO satellites was cheaper than GEO satellites.

56.     However, the Company remained optimistic that the GEO market would recover and return to historical averages.  For example, on a November 2016 earnings call, defendant Lance stated the Company was "bullish on the long-term health of the satellite industry," and defendant Wirasekara expected revenue to improve when "satellite order intake levels return to near historical averages."

57.    In October 2017, the Company acquired DigitalGlobe through a $2.4 billion debt-financed transaction.  DigitalGlobe was less capital-intensive than the GeoComm business and provided higher profit margins in a growing industry.  The Company also rebranded itself as "Maxar Technologies" and adopted the stock ticker "MAXR" on NYSE and TSX.  Moreover, the Company announced plans to "domesticat[e]" and become a U.S. entity "by the end of 2019."  The DigitalGlobe acquisition increased Maxar's intangible assets to $1.75 billion and PP&E to $1.1 billion as of December 31, 2017, from $332 million and $360 million, respectively, the prior year.

58.    The DigitalGlobe acquisition also increased the Company's debt to $3 billion, from $600 million as of December 31, 2016.  Thus, as Maxar stated during its Investor Day on March 8, 2018, debt reduction was the "primary objective" for any free cash flow generated by the Company.

## C.    The Failure of WorldView-4

59.    DigitalGlobe's flagship satellite was WorldView-4, an imaging satellite launched in November 2016.  It cost $835 million to build, took several years to manufacture, and generated $85 million in revenue for the Company in 2018 alone.

60.    Critical to WorldView-4 is a set of three control moment gyroscopes ("CMGs"), which control the orientation of the satellite.  The CMGs  are used to point WorldView-4 in any direction with extreme precision, allowing on-demand imaging.  According to the Company, CMG failure leads to a loss of stability, and the WorldView-4 cannot capture high-resolution digital imaging, *i.e.*, its sole revenue-generating function.

61.    Several times per day, Maxar receives telemetry, *i.e.* data from its DigitalGlobe imaging satellites regarding its precise position, orientation, and performance of individual components such as CMGs.  The Company's space vehicle operators who monitor this telemetry are responsible for recognizing "anomalous spacecraft conditions," investigating "limit

violations," addressing such violations if possible, and otherwise reporting them up to the engineering team.

62.     WorldView-4 is also monitored by the Space Surveillance Network, which is operated by Joint Space Operations Center of the Department of Defense.  Space Surveillance Network regularly records and updates parameters describing the orbits of all artificial objects orbiting Earth, known as TLE data.  However, TLE data does not reflect the performance of individual components, such as CMGs.

63.     Although TLE data for WorldView-4 shows that its day-to-day movement was regular and predictable for most of its operational history, on or about October 12, 2018, the TLE data abruptly became erratic and volatile, indicating a loss of stability that has never been restored. In particular, TLE parameters known as "eccentricity," "argument of perigee," "mean anomaly," and "mean motion" all began exhibiting unpredictable variability.

## VI.     THE INDIVIDUAL DEFENDANTS FAIL TO VALUE MAXAR'S ASSETS ACCURATELY AND CAUSE THE COMPANY TO ISSUE MISLEADING STATEMENTS

### A.     Despite Indicators of Impairment, the Individual Defendants Fail to Writedown Maxar's Assets

64.     Beginning in 2017, the Company's GeoComm segment underwent a series of mass layoffs in response to a slowing market.  In February 2017, the Company laid off 161 employees at SSL's Palo Alto facility–SSL's single largest headcount reduction to date and the largest layoff in the Silicon Valley region that month.  In June 2017, the Company laid off 173 employees at SSL, again the largest mass layoff in the region that month.  The Company also laid off 66 systems engineers, according to data obtained from the State of California's Employment Development Department.

65.     On June 22, 2017, *SpaceNews* published an article titled "Lack of satellite orders triggers layoffs at Space Systems Loral," reporting that "Space Systems Loral has laid off a number of employees at its California satellite manufacturing facility" and that "SSL has not announced an order for a commercial geostationary communications satellite since July 2016."  SSL president John Celli ("Celli") explained: "We have seen an extended slowdown in orders for GEO satellites across the industry . . . .  With fewer satellites coming into the factory we have to make reductions to remain competitive."

66.     Days after the article, *SpaceNews* reported that Celli, who had been with SSL for 36 years, would be replaced by Dario Zamarian ("Zamarian"), a private equity advisor and self-described "transformation specialist" who had zero background in the space business.

67.     Zamarian's specialty was companies struggling with fundamental shifts in technology and in need of a turnaround.  Accordingly, defendant Lance became pessimistic about the future of the GEO market, stating during a July 28, 2017 earnings call "I don't know that it will ever get back to 22 satellites a year."  Similarly, on August 8, 2017 at the Jefferies Global Industrials Conference, he stated:

> But we're not counting on a huge rebound in the commercial communications market. Our growth is going to come from the remote sensing satellites we're going to build and from the U.S. government satellites.  Now, if we get a rebound, we'll benefit from that, but I'm not counting on it**.** I think that we will see a recovery, but we're going to plan pretty conservatively.
>
> . . . But going forward, will that part of the business be a growth engine? I think remains to be seen.

68.     In September 2017, at the annual World Satellite Business Week conference, Zamarian was focused on what critical satellite operators can do for Maxar, rather than on cultivating customer relationships and securing repeat business, as Celli had.

69.     By the November 2, 2017 earnings call, defendant Lance had abandoned all hope for a resurgence of GEO deals, stating "the total market is unlikely to return to historic levels." Defendant Lance continued:

> If you looked at the historic market, about 20 to 22 awards sometimes reaching as high as CAD 4 billion, we don't see it getting back to that level. I'd like to think that the industry has kind of bottomed out. We do have a strong pipeline in 2018, but as I've said before, we are not counting on a lot of order growth in the GEO comm sat area. If we get it, great. It will be upside to our plans. So we're not counting on it. . . . .[W]e expect that the [GeoComm] sat business from our reported revenue and earnings standpoint is going to be under continued pressure.

70.     By the end of 2017, all signs pointed to a structural collapse in the GEO market, not merely a temporary downturn.  In 2017, SSL only had two GEO orders.  Thus, every order won or lost in 2018 was critical to the success of the Company's GeoComm business.

71.     On January 8, 2018, unbeknownst to investors, SSL lost a GEO bid to its competitor for a hybrid broadcast-broadband satellite for Intelsat designated "Galaxy-30."

72.     Unknown to investors, the Company slashed the fiscal 2018 budget for future customer proposals.  Whereas compiling and finalizing customer proposals typically cost hundreds of thousands of dollars, managers in early 2018 were restricted to only $100,000.  Furthermore, Maxar senior management had cut the proposal budgets numerous times leading up to the end of 2017.

73.     On February 22, 2018, Maxar reported in a Form 6-K filed with the SEC that it had spent $5.5 million on management consulting fees and $11.9 million on employee severance in the first half of 2017 on a "restructuring project" initiated "[i]n response to changes in the geostationary communications satellite market."  In contrast, in 2016, the Company reported no material GEO consulting fees and only $3.6 million on severance in the GEO business. Unknown to investors, in 2017, the Company had retained management consulting firm Bain & Co. to advise on whether to stay in the GEO industry at all.

74.     On the February 22, 2018 earnings call, defendant Lance expressed that the GeoComm business "is expected to be negatively impacted by the lower booking rates" in the industry.  He also said:

> Lower industry volumes in the [GeoComm sat] market, coupled with growth opportunities in Low Earth Orbit SmallSAT constellations for communications and earth observation markets, require us to rightsize our factory footprint and invest in new capabilities and new manufacturing techniques, and I'm pleased to report all these activities are already well underway.

75.     Defendant Lance further stated that internal projections only forecast about 10 to 14 GEO awards in the market in 2018 and 2019, so the Company's "growth is going to come from kind of reaching the bottom point on GEO and then leveraging all of our capabilities around U.S. government and the LEO markets."

76.     During the same call, Chief Financial Officer William McCombe ("McCombe") stated that year-over-year declines in the GeoComm business offset revenue growth in the Company's other segments:

> Total company revenues declined 7% year-over-year in the quarter.  Our Imagery business recorded strong revenue growth year-over-year; however, this was more than offset by declines in the Space Systems segment where the step-down in award values in the GEO ComSat market since 2015 continued to flow through as lower revenue in the current quarter together with a lower level of planned activity on the RCM project for the Canadian government.

77.     During the same call, McCombe added that "Space Systems experienced a 15% year-over-year pro forma revenue decline in Q4 as increases in our U.S. Government business were more than offset by declines in the commercial satellite revenues and on the Canadian RCM project."  The failing GeoComm business would continue to drag the Company's total revenues, as McCombe stated:

> We expect total company pro forma year-over-year revenues to decline 2% to 4% in 2018, as compared to 2017, driven by declines in our Space Systems segment, in part offset by continuing solid growth in the Imagery and Services segments.

> Our Space Systems business continues to feel the impact of the stepdown in [GeoComm sat] award values that began in 2015. We have seen these award values stabilize at lower levels in the last couple of years, thus providing a backdrop for a potential stabilization of the segment's revenue streams in the coming years.

78.     On February 26, 2018, McCombe, who had served SSL since 2014 and was familiar with its finances, abruptly resigned.  He had only served as CFO for five months, and he did not secure another position until nine months later.

79.     Wirasekara became Interim CFO while the Company searched for McCombe's replacement.  Though McCombe had overseen the preparation of the financial statements and regulatory filings for fourth quarter and full year 2017, he did not certify the Company's annual financial statements.  Wirasekara finally did so on March 29, 2018, over a month after the earnings announcement and filings.

80.     On March 8, 2018, at New York Investor Day, defendants Lance and Wirasekara continued to present the GeoComm business as a drag on the Company and would be the only segment exhibiting negative growth in future years.  Defendant Lance presented a slide showing the 20% decline in 2017 and 2018 for GeoComm satellite and RCM revenue:



81.     Regarding the Company's revenue projections for 2018 to 20, defendant Lance

stated:

> When you put that into a slide that shows '16, '17, '18, and then the next couple of
> years, you see our view that we're at a point of inflection. As the declines in GEO
> reach bottom, and then as we see the RCM program ending, we pave the way to see
> the underlying growth come through, which we believe is going to be positive and
> generate greater earnings, greater cash flow and the potential for increased margins:



82.     Regarding EBITDA, defendant Lance stated that the GeoComm business has been

marginalized due to its decline, stating:

> You know this is a kind of a good news/bad news slide looking at GeoComm sat
> because . . . it used to be a larger part of the business. But the point of the slide
> today is we've really had it marginalized, both as a result of its decline and the rest
> of the business growing, and the combination with DigitalGlobe, now, giving us
> new legs for growth as Maxar combined company.



83.     When predicting earnings growth over the next five years, defendant Lance acknowledged that the Company expected "-2 to -4%" growth in GeoComm, the only negative forecast across the entire company.

84.     During the same Investor Day, defendant Wirasekara represented "stable" guidance for fiscal 2018 amid "very strong headwinds" in the GeoComm satellite business and "the winding down of the RCM contract in Canada."   He also acknowledged that the 45% decline in the GeoComm market over the prior two years affected "a large segment" of the Company's business.

85.     In response to the "drag on the Company" and to limit its impact on the Company's financial health, defendant Lance stated that Maxar's satellite manufacturing facility would shift away from GEO production:

> I'm not going to allow the [GeoComm] product line to be a drag on the company going forward.  That either bottoms out or it grows.  In the meantime, Dario [Zamarian] will talk about his factory, future work and how we are reconstructing the whole facility to deal not with 25 GEO satellites, but with a combination of fewer GEO satellites and lots of SmallSats. So we're looking at lots of ways that we can take out costs to further lower our breakeven.

* * *

> And we've had such large declines [in EBITDA] that these aren't incremental steps we're taking. It's really a retooling of how we're organized in the factory and what the support and overhead costs are.

86.     When asked to expound on Maxar's financial flexibility if the GEO market does not "bottom out" within the next eighteen months, defendant Lance conceded that the Company did not expect the market to recover at all, so it had cut its GEO manufacturing output capacity to save money on fixed costs:

> I don't know off the top of my head what the percentage is.  Fixed costs have probably not come down linearly with revenue. Direct costs have. We've taken out, over the last 18 months, probably 450 people.  We didn't want to do that, but obviously the volume wasn't there to support it.  We have had step-function reductions in fixed costs, but I would say the next wave of that is what Dario and his team are looking at right now.  Fixed costs tend to come out more like a stairstep, whereas direct labor can come out more linearly.  But we were hopeful – [20/20] hindsight, which you'd always love to have, we were hopeful the market was going to rebound a little more. And I think it's only during the last 6 to 9 months that after doing a lot of external market study, we've concluded that the market is going to stay at this level, we think, or maybe slightly above it as some of these replacements come along.  And so we were hesitant to go in and take out large chunks of fixed costs because if the volume goes up, you need those.  But we've now made the decision to do that.

87.     Moreover, during the New York Investor Day, Zamarian stated that the Company expected "between 8-12 a year" in GEO orders, less than half of the historical 20-22 annual orders.

88.     On March 13, 2018, at the J.P. Morgan Aviation, Transportation & Industrials Conference, defendant Lance made similar statements about the outlook for GEO orders:

> On the commercial side, we see strong near double-digit growth for data and the analytics and products that go along with that. And we see the changes that are now at an inflection point in the changes in the communications satellite market. So the GEO market today is about 40% of where it was 3 years ago.  And we've mitigated this business through the growth in diversification, and we're not counting on it improving over time.  So it's been a tremendous headwind because of the difficult cost. Going forward, as that business bottoms out, the underlying growth of the rest of the market, especially in SmallSats and U.S. government and international government growth, are going to show through.

89.     Three weeks later, again unbeknownst to investors, SSL lost a GEO bid to its

competitor for a broadband satellite for the European Organisation of Telecommunications by

Satellite S.A. designated "Konnect VHTS."

90.     On March 26, 2018, the Company announced two new GEO orders: (i) a satellite

designated "AMOS-8" for Spacecom; and (ii) a satellite for an existing customer, the Broadcasting

Satellite System Corporation of Japan ("B-SAT").  Maxar's press release announcing the AMOS-

8 award stated:

> PALO ALTO, CA and TEL AVIV, Israel, March 26, 2018 /PRNewswire/ –
> Spacecom (TASE: SCC), operator of the AMOS satellite fleet, today announced it
> has chosen SSL, a Maxar Technologies company (formerly MacDonald, Dettwiler
> and Associates Ltd.), (NYSE: MAXR; TSX: MAXR) to build its AMOS-8
> advanced communications satellite.  The satellite will deliver state-of-the-art
> broadcast, broadband and data services from Spacecom's 4° degrees West
> 'hot  spot' to Europe, Africa and the Middle East.
>
> AMOS-8 will include flexible high power Ku-band and Ka-band payloads with
> steerable antennas to enable customers to deliver various added value services. The
> satellite is designed to provide service for a minimum of 15 years, and is based on
> the world's most popular commercial communications satellite platform – the SSL
> 1300 – which has the capability to support a broad range of advanced applications
> and technologies.
>
> "SSL is dedicated to delivering advanced space systems and services that inform,
> entertain and connect people around the globe," said Dario Zamarian, group
> president of SSL.   "SSL will demonstrate our industry-leading technological
> capabilities, our legacy of expertise and our commercial mindset to meet all of
> Spacecom's mission requirements.  We are honored to be selected to manufacture
> this satellite, which will enable access for underserved people in Europe, Africa
> and the Middle East to high-speed, reliable data – a connection essential in today's
> digital world to understand what is happening across the planet and participate fully
> in the global community."
>
> The AMOS-8 geostationary communications satellite will be co-located with
> AMOS-3.  A contract option has been signed between Spacecom and SpaceX for
> AMOS-8's scheduled launch in the second half of 2020.
>
> "AMOS-8 will bring additional high-quality capacity to expand our offerings and
> provide our partners with the abilities to add new and exciting services," said David
> Pollack, CEO and president of Spacecom.  "Spacecom is dedicated to delivering
> reliable and cost-effective services that are enjoyed and relied upon by millions of

people and businesses.  We are eager to work together with SSL to develop this new satellite."

91.     SSL's social media also touted the awards, stating: "2018 is off to a great start for SSL with two contracts to build GEO satellites announced today.  Thank you B-SAT and Spacecom for placing your trust in SSL!"  Later that day, on SSL's public Twitter account, the Company shared a tweet by *SpaceNews* journalist Caleb Henry stating that "@sslmda gets two GEO satellite orders, both of which need to be in orbit in 2020. Those are tight deadlines, but SSL has hit them before."  Within two weeks of the March 26, 2018 announcement, the Company added the B-SAT and Spacecom orders to SSL's webpage titled "Award and Launch History – GEO and LEO Satellites."

92.     The above statements in ¶¶ 90-91 were misleading because they failed to disclose that the AMOS-8 contract "was not a definitive award" because: (i) the contract was not effective until SSL received the first payment from Spacecom; (ii) Spacecom could withdraw from the deal within 60 days without any penalty; and (iii) Spacecom was entirely reliant on future bond offerings to fund AMOS-8.

93.     Spacecom's award to SSL, an American manufacturer, was sharply criticized, as most of the AMOS satellites had been awarded to Israeli Aerospace Industries ("IAI"), a state-owned manufacturer.  SSL had underbid IAI by nearly $80 million and promised a speedier production schedule.  Thus, the award "stoked fears that it could spell doom for Israel's domestic satellite production, as Spacecom is the only customer for IAI's satellite department, which also builds the Ofek line of spy satellites," according to an article by *DefenseNews*.

94.     On April 9, 2018, IAI promoted a communications satellite that would serve government and commercial needs "to be stationed at point 4.0° W above the equator," *i.e.* Israel's national space location, thus displacing AMOS-8.

23

95.    The Israeli government was receptive to IAI's offer.  On April 30, 2018, the technology journal *Calcalist* published the article "Israeli Government Intervention Likely to Void Deal with U.S. Satellite Contractor Loral":

> In a filing to the Tel Aviv Stock Exchange on Monday, Spacecom, also known as Space Communication Ltd., announced it has received a letter from a government official on Sunday, informing the company that the state intends to "work towards placing a satellite by Israel Aerospace Industries Ltd. (IAI)," a state- owned company, at the geostationary position intended for AMOS-8, which belongs to Israel.
>
> The announcement could mean that Israel plans to launch its own satellite through IAI, cutting Spacecom out of the loop. It may also mean Spacecom can find its way back into the deal if it commissions the satellite from IAI. In both scenarios, American Loral loses the contract.

96.    Though the AMOS-8 deal was in jeopardy, on the May 9, 2018 earnings call, defendant Lance still touted the award:

> We were very pleased to report in the quarter that we were awarded 2 new GEO communications satellites.
>
> . . . Israeli satellite operator [Spacecom] selected SSL to build the AMOS-8 satellite. This will deliver state-of-the-art broadcast, broadband and data services from its 4-degree West hot spot to Europe, Africa, and the Middle East. AMOS-8 will include flexible, high-power Ku-band and Ka-band payloads, with steerable antennas to enable [Spacecom] to deliver a number of value-added services.

97.    On May 9, 2018, the Company's press release listed AMOS-8 as a "notable booking in the Space Systems segment."  Similarly, AMOS-8 was listed as a "key accomplishment" in the Company's slide deck for its first quarter 2018 financial results.

98.    The above statements in ¶¶ 96-97 were misleading because they failed to disclose that the AMOS-8 contract "was not a definitive award" because: (i) the contract was not effective until SSL received the first payment from Spacecom; (ii) Spacecom could withdraw from the deal within 60 days without any penalty; and (iii) Spacecom was entirely reliant on future bond offerings to fund AMOS-8

99.     On May 9, 2018, the Company reported its first quarter 2018 financial results in a Form 6-K filed with the SEC for the period ended March 31, 2018.  In its balance sheet, the Company reported intangible assets of $1,698.2 million, PP&E of $1,066.4 million, and inventories of $100.5 million.  In its income statement, the Company reported net earnings of $31 million and net EPS of $0.55.

100.     On the May 9, 2018 earnings call, defendant Lance continued to represent that the Company expected about 50% of the "nominal level of around 20 awards" in 2018 and that Maxar would look for ways to "align [its] costs longer-term with . . . a sustained, lower level of GEO market orders."  Additionally, defendant Wirasekara remarked that the "continued weakness" in the GeoComm satellite market "more than offset" the Company's revenue growth in other segments.

101.     The above statements in ¶¶ 99-100 were misleading because they failed to disclose the impaired value of GeoComm CGU.  As of March 31, 2018, external and internal indicators of impairment existed, including the unprecedented layoffs, low booking rates, and declining performance of the GeoComm business.  *See* ¶¶ 71-89.  Had Defendants complied with IFRS standards in 1Q18, Maxar would have accrued impairment charges of at least $37.7 million to inventories, $260.3 million to intangible assets (excluding goodwill) and $85.6 million to PP&E.  Had the Company conducted an IAS 36 impairment test and accrued associated impairment charges on a timely basis, Maxar would have reported 1Q18 consolidated inventories, intangibles, and PP&E of $62.8 million, $1.4 billion, and $980.9 million, respectively. Had the Company conducted an IAS 36 impairment test and accrued associated impairment charges on a timely basis, Maxar would have reported a 1Q18 net loss and basic loss per share of -$352.6 million and -$6.25, respectively.

102.    Several media articles further cast doubt on the viability of the AMOS-8 deal to SSL.  On May 22, 2018, *DefenseNews* reported that the Israeli government intervened, favoring an award to an Israel-made satellite, to ensure Israel "maintains the independent ability to use satellites to collect and transmit information by way of Israeli communication satellites."

103.    On May 27, 2018, *Calcalist* reported that Spacecom had failed to make its initial payment for AMOS-8 and that, as a result, the deal should have become void. SSL agreed to extend the down payment deadline by 30 days.

104.    Unknown to investors, due to the missed payment, Maxar's management prohibited the SSL Program Manager to proceed with the AMOS-8 project and declined to purchase the parts needed to build AMOS-8.

105.     On June 19, 2018, Israeli newspaper *Haaretz* reported that Defense Minister Avigdor Lieberman stated: "Right now it looks like we will buy a blue-and-white satellite A to Z, and not just for the sake of IAI," displacing the award to SSL.

106.    On June 25, 2018, *Calcalist* reported that Spacecom again failed to make the initial payment. SSL agreed to a second extension, this time of 60 days, until September 25, 2018.

107.    Unknown to investors, at some point between June 10, 2018 and June 29, 2018, the Company quietly removed the AMOS-8 award from its webpage listing GEO awards.  The Company did not issue any press releases or otherwise make any public statements at that time regarding AMOS-8.

108.    In June 2018, the Company's management told BMO Capital Markets analyst Thanos Moschopoulos ("Moschopoulos") in a closed-door meeting that it was not expecting a rebound in the market, that the Company expected long-term demand of 8 to 12 awards per year, and that "its outlook for the market has become more cautious than it had been just six months

ago."   In a note, Moschopoulos set forth three scenarios that management was considering to mitigate the declining trends in the GeoComm market:

(a)      "right-sizing its GEO operations in Palo Alto, to bring its footprint and cost structure to a level that's better aligned with a more conservative long-term demand outlook";

(b)      "partnering with another manufacturer in order to share costs and give the combined business greater scale"; or

(c)      "exiting the GEO business altogether, if it ultimately concludes that it can't remain in the business while earning an acceptable [return on invested capital]."

109.    On June 28, 2018, the Company laid off 109 SSL employees, again the largest mass layoff in the Silicon Valley region that month.  Notably, five of the employees had been SSL Vice Presidents.   Furthermore, the Company had laid off business development managers, who maintained customer relationships and submitted bids to European operators, thus assuring that SSL would not be awarded the two remaining GEO orders, which went to SSL competitors instead.

110.    During the six months ending June 30, 2018, the Company spent $12.6 million on employee severance and "enterprise improvement costs."   According to Maxar, these were "restructuring . . . costs" "primarily related to employment termination within our Space Systems segment" and "undertaken in response to fluctuations in the geostationary communication market and to align with our new strategy."  "Enterprise improvement costs related to consultant fees for a project to evaluate strategic alternatives for its GeoComm business."

111.    In an article published on July 24, 2018, *SpaceNews* confirmed that the Company was considering "strategic alternatives" for GeoComm:

> "We have experienced material satellite order declines in recent years, as a result
> of end market supply and demand factors and additional capacity coming on orbit
> from [high-throughput satellites] and [low-Earth-orbit] constellations," Maxar said
> in an emailed statement.   "SSL has responded appropriately to manage its

workforce and costs during this challenging time.  As previously stated, we are continuing to review strategic alternatives for our GEO communications satellite business to improve its financial performance. No final decision has been made. At the same time, we continue to see strong growth in our US Government and LEO communications and Earth observation businesses and remain encouraged regarding the potential in these markets."

112.     However, by raising the possibility of an exit, Maxar inadvertently assured that it would not be awarded GEO orders, as potential customers were deterred by the Company's apparent lack of commitment to the GeoComm business.

113.     On the July 31, 2018 earnings call, defendant Lance remained pessimistic about the future of the GeoComm market:

We've already discussed the Telesat LEO award, which could be the first step in a multibillion-dollar production program for Maxar. So where does that leave the GEO Communications market?  As we've discussed at length in the past, industry orders fell significantly in 2015 and have remained at those low levels ever since. At this point, we do not expect a significant recovery for this market, with industry orders likely to be at the low end of the 8 to 12 awards range this year 2018.

From our perspective, industry growth clearly is moving in the direction of LEO and NEO [constellations], with the demand for GEO primarily driven by the replacement needs of existing satellites.  As such, we are examining a range of strategic alternatives for our [GeoComm sat] line of business. We continue to align our workforce size with the operations and engineering work to be done.  We continue to exit leased buildings and consolidate our footprint on the Palo Alto campus.

114.     Though Maxar had not reached a final decision regarding the "strategic alternatives," defendant Lance did not expect "a market recovery for GEO" and "at a minimum, [the Company was] downsizing, continuing to cut staff to align with the workload, cutting our footprint, making available some of our owned facilities for sale and moving into as small a footprint as possible on a go-forward basis."

115.     Analysts questioned the shift from Investor Day, when defendant Lance expressed that the GeoComm market had reached an "inflection point," to its current pessimism and pursuit of strategic alternatives. Defendant Lance responded:

Yes. I don't think that our view has changed. I think the words we used and have used since March is that we expected a bottoming. And that's really referring to our revenue from this sector.  So as we launch more satellites than we book, our revenues have been coming down quarter and quarter and quarter for some time. So the bottoming occurs when we essentially reach kind of a steady state from a revenue standpoint.  And we believe that we're just about there.

The orders this year, that the industry is now – that we're expecting for the industry is very much on par with last year. I think last year was about 7, we think it's going to be around 8 or so this year.  And that results in a limited amount of bookings. And revenue continues to decline. So I don't think that our view of that has really changed since the March time frame. We continue to look at alternatives as we've discussed.  And we will, in the near future, reach a conclusion with this business on how we go forward.

116.   Defendant Lance also acknowledged that the business remained a drag on the Company: "Clearly, we're being held down today by the margins in the GEO business . . . ."

117.   On the July 31, 2018 earnings call, defendant Wirasekara again expressed that the "significant decline in the Space Systems business, [which was] impacted by a step down in award values" "more than offset" the revenue growth in other segments.  He continued: "Space Systems experienced a 3% year-over-year revenue decline in Q2 as growth in our U.S. Government and smallsat businesses were more than offset by the decline in the GEO Communication satellite business and our work on the Canadian RCM program that is nearing completion."

118.   On July 31, 2018, the Company reported its second quarter 2018 financial results in a Form 6-K filed with the SEC for the period ended June 30, 2018.  In its balance sheet, the Company reported intangible assets of $1,673.4 million, PP&E of $1,060.5 million, and inventories of $95.3 million.  In its income statement, the Company reported net loss of $18.6 million and net loss per share of $0.33.

119.   The above statements in ¶¶ 113-118 were misleading because they failed to disclose the impaired value of GeoComm CGU.  As of June 30, 2018, external and internal indicators of impairment existed, including the unprecedented layoffs, low booking rates, and declining

performance of the GeoComm business.  *See* ¶¶ 71-89, 103-104, 106-117.  Had Defendants complied with IFRS standards in 2Q18, Maxar would have accrued impairment charges of at least $37.7 million to inventories, $260.3 million to intangible assets (excluding goodwill) and $85.6 million to PP&E.  Had the Company conducted an IAS 36 impairment test and accrued associated impairment charges on a timely basis, Maxar would have reported 2Q18 consolidated inventories, intangibles, and PP&E of $57.6 million, $1.4 billion and $975.0 million, respectively.  Had the Company conducted an IAS 36 impairment test and accrued associated impairment charges on a timely basis, Maxar would have reported a 2Q18 net loss and basic loss per share of -$402.1 million and -$7.03, respectively.

120.    Although indicators of impairment existed prior to July 1, 2018, *see* ¶¶ 71-89, 103-104, 106-117, the Individual Defendants caused the Company to claim: "For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present."  The failure to test and writedown impaired assets as of March 31, 2018 or June 30, 2018 conflicted with defendants Lance's and Wirasekara's public statements indicating that the GeoComm assets may be impaired.

**B.**    **The Truth about the Value of Maxar's Assets Begins to Emerge, While the Individual Defendants Continue to Issue Misleading Statements About WorldView-4**

121.    On August 7, 2018, before the markets opened, Spruce Point issued a report questioning Maxar's financial status and the Company's accounting practices.   Among other things, the report alleged that "Maxar's balance sheet is inflated with goodwill and overcapitalized intangible assets" and estimated that Maxar's intangible assets were impaired by hundreds of millions of dollars.

122.    On this news, Maxar's share price fell $5.34, or over 13%, to close at $38.44 per share on August 7, 2018, on unusually heavy trading volume.

123.     The same day, after the market closed, Maxar issued a response refuting the Spruce

Capital report.  The Company's press release titled "Maxar Technologies Responds to Misleading

Short Sell Report" stated, in relevant part:

> The report on Maxar Technologies Ltd. ("Maxar" or the "Company", formerly
> MacDonald, Dettwiler and Associates Ltd.) (NYSE and TSX: MAXR) released
> today by Spruce Point Capital Management contains a number of inaccurate claims
> and misleading statements.  Maxar believes it is a direct attempt by a short- seller
> to profit, at the expense of Maxar shareholders, by manipulating Maxar's stock
> price.

> Maxar continues to execute against its strategy, and recently reaffirmed its full year
> 2018 guidance for revenue and cash flow from operations, while increasing its full-
> year adjusted EPS outlook.  Maxar believes that the Company remains positioned
> for future growth. Management and the Board of Directors are focused on
> delivering enhanced value for all Maxar shareholders.

> Maxar continues to be fully committed to transparency in all of its investor
> presentations and financial reports.

124.     The above statements in ¶ 123 were misleading because they failed to disclose that,

due to the Spruce Capital report, Maxar's Audit Committee launched an investigation into the

alleged accounting errors and would be assisted by the Company's new certified public

accountants and "independent" third-party consultants.

125.     Despite the Company's apparent rejection of the claims in the Spruce Capital

report, Maxar's stock price fell $1.82, or nearly 5%, to close at $36.69 per share on August 8,

2018, on unusually heavy trading volume.

126.     On August 24, 2018, before the markets opened, Maxar issued a "comprehensive"

response to the Spruce Capital report, acknowledging that its GeoComm assets may be impaired:

> The Company is exploring strategic alternatives regarding the future of its GEO
> communications satellite line of business and has continuously implemented
> actions to right size the business to maximize near-term profitability.  Mature
> demand for satellite-based video distribution, falling satellite-based broadband
> pricing, and alternative LEO and MEO technologies have negatively impacted the
> Company's GEO communications satellite line of business.  The Company has
> discussed these market factors and has provided updated industry outlooks in each

of the Company's recent quarterly filings, as well as in its quarterly investor calls and its Investor Days in March 2018. The SSL acquisition, and the reorganization as part of its U.S. Access Plan, has also allowed the Company to begin to compete on and win attractive U.S. government space systems and commercial LEO satellite contracts that are driving growth and creating value for shareholders.

The Company's facilities in Palo Alto, CA are significantly over-sized for today's market and under-absorbed overhead costs have contributed to reduced profitability and negative cash flows in the Space Systems segment.  The strategic alternatives under consideration include partnering with another satellite manufacturer to gain scale benefits, the sale of the GEO satellite line of business, or the exit of the GEO satellite line of business following completion of existing contracts in backlog and sale of its facilities.  The monetization of the Company's real estate assets in Palo Alto are estimated to be in a range of $150 to $200 million. LEO small satellite production for commercial communications, remote-sensing and U.S. Government customers is expected to be relocated to the Company's facility in San Jose, CA. A decision on the future strategic direction of the GEO communications satellite business is expected to be made by the end of 2018. As a result, this line of business may be classified as a discontinued operation.

The Company expects that under certain of these scenarios, non-cash write- downs or an impairment of assets could occur as a result of lower future revenue expectations, industry outlook and overall valuation of the GEO communications satellite line of business. The Company routinely evaluates assets for impairment in the fourth quarter of each year, and in interim quarters when there is an indicator of possible impairment.  As part of its preparation of its financial statements for the third quarter of 2018, the Company will, consistent with IFRS rules, estimate the recoverable amount of the GEO communications satellite line of business assets, including goodwill, other intangible assets, capitalized development, and inventory, and will recognize an impairment or non-cash write-down if the recoverable value of the assets is determined to be less than their carrying value. We believe that, given the continued decline in the GEO communications satellite business, it is possible that an impairment or write-down will be recognized in the third quarter of 2018. However, our analysis is not complete and, accordingly, we are unable to estimate the amount of the possible impairment or write-down at this time.

In addition, cash costs for certain employee severance, pension and other liabilities could be incurred.  We have already implemented a series of ongoing actions to right size the business in the near term to conserve cash.  During the six months ended June 30, 2018, the Company incurred employee severance and enterprise improvement costs of $12.6 million.

127.    On this news, Maxar's stock price fell $2.00, or nearly 6%, over two consecutive trading sessions to close at $33.92 per share on August 24, 2018, on unusually heavy trading volume.

128.     On September 3, 2018, shareholders learned that Maxar had lost the AMOS-8 project.  The Israeli Ministry of Science and Technology announced in Hebrew that AMOS-8 would be built in Israel and funded by the Israeli government.

129.     On this news, the Company's share price fell $1.71, or nearly 6%, to close at $29.34 per share on September 4, 2018, on unusually heavy trading volume.

130.     On September 25, 2018, in a Hebrew-language filing with the Tel Aviv Stock Exchange, Spacecom stated that it would not be making a down payment to Maxar for the AMOS-8 contract.

131.     On this news, the Company's share price fell $1.63, or nearly 5%, to close at $33.18 per share on September 26, 2018, on unusually heavy trading volume.

132.     On October 9, 2018, the Company significantly accelerated its schedule for U.S. domestication to January 2019, from prior commitment of "no later than December 31, 2019."

133.     On October 31, 2018, the Company issued a press release reporting its third quarter 2018 financial results, in which it disclosed $383.6 million impairment and inventory charges related to GeoComm business.  The press release stated, in relevant part:

> "We recognized impairment losses of $345.9 million and an inventory obsolescence charge of $37.7 million related to the GEO Comsat business this quarter. This non- cash charge reflects the decline in the business and our decision to evaluate strategic alternatives for GEO Comsat." [quoting CFO Biggs Porter]

*      *      *

> The Company announced in Q1 2018 that Space Systems/Loral, LLC ("SSL"), a wholly owned subsidiary of Maxar, was selected by Spacecom to build its AMOS-8 advanced communications satellite.  In September 2018, this contract became void when the customer did not make the initial payment and it became evident that the Spacecom would not achieve financing on the project. The voiding of this contract did not have an impact on the Company's backlog, as it was not a definitive award and was not included in backlog.

During the three months ended September 30, 2018 the Company recognized impairment losses of $345.9 million and inventory obsolescence of $37.7 million related to the GeoComm business.

134.     The same day, the Company filed a Form 6-K with the SEC which justified the

impairment and inventory charges, stating in relevant part:

**Impairment of Non-Financial Assets**

Non-financial assets are tested annually for impairment in the fourth quarter or whenever there is an indication that an asset may be impaired.  Non-financial assets that do not generate independent cash flows are grouped together into a cash generating unit ("CGU"), which represent the level at which largely independent cash flows are generated. An impairment loss is recognized in earnings to the extent that the carrying value of an asset, CGU or group of CGUs exceeds its recoverable amount.  Impairment is first evaluated by management at the CGU level, absent allocated goodwill.

The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards.  During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS-8 satellite, a key program with the Israeli government. By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds.  For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.

In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed.  In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels.  Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

The aggregation of the above factors resulted in an impairment trigger being identified as at August 31, 2018 at the GeoComm CGU.  The Company first performed an impairment test of the GeoComm CGU.  The impairment test of the GeoComm CGU evaluated the non-financial assets held by the Company based on an asset group level, absent allocated goodwill. Assets were aggregated to the level in which independent cash flows could be generated for their respective groupings. The carrying values of these asset groups were compared against their fair value less costs of disposal for possible impairment and an impairment loss of $345.9 million related to property, plant and equipment and intangible assets was recorded for the three months ended September 30, 2018.

*       *       *

**Inventory Obsolescence**

. . . The Company was previously holding inventory on hand in anticipation of awards to be won during the second half of 2018 and for the AMOS 8 program. The impacts from the loss of AMOS 8 and inability to obtain the forecasted awards culminated during the third quarter of 2018. These factors compelled the Company to re-evaluate its inventory reserves for inventory that was previously pegged to forecasted usage.

All GeoComm inventory subject to discernment over future use based on forecasts was assessed for possible obsolescence. The result of the re-assessment of future usage of the on-hand inventory was an incremental inventory obsolescence reserve of $37.7 million for the three months ended September 30, 2018.

135.    Also on October 31, 2018, before the markets opened, the Company held a conference call with analysts and investors to discuss the financial results.  During the call, defendant Lance noted that the GeoComm business "remain[ed] weak," leading the Individual Defendants to pursue strategic alternatives:

Market trends at the U.S. and international government levels remain very positive, with growing budgets to fund increased space investments.  The global threat environment is persistent, and that's driving higher spending levels in key areas that we can address. All of our business segments will benefit from the trends noted on this slide.

The legacy GEO Comsat market, of course, is an exception, and it remains weak, with industry orders at the lowest level in recent history.  The severity and persistence of this market downturn led us to announce the pursuit of strategic alternatives for the GEO product line at the end of July.  We are in active discussions, continue to expect to announce a definitive direction for this business by the end of the year.

136.    Acknowledging that he had stated "for a few quarters that [Maxar was] now trending in GEO toward a loss," defendant Lance stated that the "primary path remains to sell the business" and that there were "multiple interested parties."

137.    During the same call, CFO Biggs Porter ("Porter") attributed the impairment and inventory charges to, in part, the declining market and stated that these charges directly caused the Company to incur losses for the quarter:

> IFRS EPS was a loss of $7.31 versus a gain of $0.34 in the third quarter of 2017, driven largely by the $384 million in noncash impairment inventory obsolescence charges related to the GEO Comsat business.  As Howard mentioned earlier, the current state of this market, together with other factors, necessitated an analysis of the carrying value of the GEO Comsat assets on our balance sheet.  This led to an impairment loss of $346 million related to property, plant and equipment and intangible assets and an inventory obsolescence reserve of $38 million during this quarter.
>
> *       *       *
>
> On an IFRS basis, we posted a loss of $7.29 year-to-date versus a gain of $0.98 in 2017.  Again, the major driver of the decline was the impairment and inventory charges I mentioned earlier.

138.    On this news, the Company's stock price fell $12.16, or nearly 45%, to close at $14.91 per share on October 31, 2018, on unusually heavy trading volume.

139.    Moreover, the Form 6-K filed on October 31, 2018 stated that Maxar's "actual results [could] differ materially from current expectations [based on certain risks, including] loss of, or damage to, a satellite before the end of its expected operational life."  Under "Subsequent Events," Maxar only disclosed that a quarterly dividend was issued on October 31, 2018.

140.    On November 6, 2018, the Company held a special call to announce an extension to an EnhancedView contract with the government, during which defendant Lance stated:

> There will be opportunities for us to negotiate and agree to pricing for additional capacity in the future, either from Worldview-4 or WorldView Legion once that constellation is on orbit.

* * *

> As I indicated Audrey, we think there are multiple opportunities over time with the NRO to increase contract, either current contract or have additional contracts related to things like adding RADARSAT-2 imagery, ***adding additional capacity either from WorldView-4 today or from WorldView Legion, recognizing the increased revisit we're going to be providing, finding more ways to provide analytics, and so on***.

141.    On November 28, 2018, defendant Lance presented at the Credit Suisse Annual Industrials Conference with slides stating "Opportunity for additional capacity to be supplied in the future from WorldView-4 and WorldView Legion" and suggesting that WorldView-4 was engaged in "on-orbit" operations and would continue to be until the year 2027.

142.    The above statements in ¶¶ 139-141 were misleading because they failed to disclose: (i) that WorldView-4 had lost stability beginning no later than October 12, 2018; and (ii) that it was no longer a fully-functioning satellite capable of supplying high-resolution imagery to customers on demand.

143.    In December 2018, the Company announced its sale of certain real estate in Palo Alto to Google for $70 million, a 4.5 acre property that was once home to 400 SSL satellite design and production engineers, to pay down Maxar debt."

144.    Two weeks later, the Company disclosed credit agreement amendments to increase Maxar's "maximum consolidated debt leverage ratio," *i.e.*, the total amount the Company can borrow in proportion to its earnings.

## C.    The Truth Fully Emerges

145.    On January 2, 2019, Maxar announced that it had completed its "domestication" plan and became a U.S. entity incorporated in Delaware.

146.    On January 7, 2019, the Company finally revealed that WorldView-4 "experienced a failure in its control moment gyros ('CMGs'), preventing the satellite from collecting imagery

due to the loss of an axis of stability," and that "WorldView-4 will likely not be recoverable and will no longer produce usable imagery." The Company did not attribute the loss of WorldView-4 to anything other than CMG failure.

147.    On this news, the Company's stock price fell $3.69, or over 31%, to close at $8.03 per share on January 7, 2019, on unusually heavy trading volume. The next trading session, the stock price fell $2.00, or nearly 25%, to close at $6.03 per share on January 8, 2019, on unusually heavy trading volume.

148.    On January 14, 2019, defendant Lance resigned as CEO, President, and director. According to defendant Estes, Maxar replaced Lance "[g]iven the company's performance in 2018 and the loss of over 90% of our value in the marketplace."

149.    On February 28, 2019, the Company reported an $883 million impairment charge, primarily driven by "the decline in [Maxar's] market value" and "the continuation of a weak GEO Comsat market." This impairment included a $162 million writedown for the loss of WorldView-4, $636 million impairment to goodwill, and $85 million in net impairment losses to GeoComm assets.

150.    In Maxar's proxy statement filed on March 28, 2019, the Audit Committee reported that management had identified material weaknesses in Maxar's financial reporting processes:

> During 2018, management documented its internal controls and completed its testing and evaluation of internal control over financial reporting. The Audit Committee met regularly with management and the independent auditor, KPMG U.S., to discuss the progress of the evaluation. Based on the Company's internal review, management identified material weaknesses in the Company's internal control over financial reporting as of December 31, 2018 related to an insufficient complement of trained resources, ineffective continuous risk assessment, and ineffective control activities related to percentage-of-completion revenue and cost of sales, measurement and disclosure of income taxes, and commitment and contingency disclosures have been identified and included in management's assessment.

151.    That same month, Jose A. Torres, Jr. – the Company's Chief Accounting Officer at all relevant times – resigned from Maxar.  The Company did not appoint his replacement until five months later.

152.    Despite these revelations, the Individual Defendants have allowed the Company and its representatives to issue inconsistent statements as to when WorldView-4 failed.  In January 2019, a Company spokesperson declined to respond to a reporter at *The Globe and Mail* who had directly asked when the CMG failure occurred. In February 2019, defendant Jablonsky stated that WorldView-4 "became inoperable at the first of the quarter."  In March 2019, Maxar stated in its annual report that WorldView-4 failed "[d]uring December 2018."

153.    Maxar was never able to find a willing buyer for the GeoComm business, which has not won a typical GEO order since the Japanese B-SAT award a year and a half ago.  In April 2019, Zamarian separated from the Company.  The Company has rebranded SSL as Maxar's "Space Solutions" group.

154.    In June 2019, *Reuters* reported that Maxar is exploring the sale of its MDA subsidiary – the Company's only remaining operations in Canada – with the goal of raising $1 billion to pay down Maxar's long-term debts.

## VII.    DAMAGES TO THE COMPANY

155.    As a direct and proximate result of the Individual Defendants' conduct, Maxar has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a)  Legal fees incurred in connection with the Securities Class Action;

b)  Any funds paid to settle the Securities Class Action;  and

c)  Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Maxar.

156.    In addition, Maxar's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

157.    The actions complained of herein have irreparably damaged Maxar's corporate image and goodwill.  For at least the foreseeable future, Maxar will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Maxar's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

158.    Plaintiff brings this action derivatively in the right and for the benefit of Maxar to redress injuries suffered, and to be suffered, by Maxar as a direct result of breaches of fiduciary duty by the Individual Defendants, gross mismanagement, and violations of Section 10(b) and 20(a) of the Exchange Act.  Maxar is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159.    Plaintiff will adequately and fairly represent the interests of Maxar in enforcing and prosecuting its rights.

160.    Plaintiff has continuously been a shareholder of Maxar at times relevant to the wrongdoing complained of and is a current Maxar shareholder.

161.    When this action was filed, Maxar's Board of Directors consisted of defendants Estes, Cyprus, Isham, Kehler, Mason, Phillips, Zahler, and Jablonsky and non-party director Decyk.

**Defendants Cyprus, Mason, and Phillips**

162.     Cyprus, Mason, and Phillips served as members of the Company's Audit Committee.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  As alleged herein, indicators of impaired GeoComm assets existed as early as the quarter ended March 31, 2018, but the Audit Committee conducted an investigation and recorded impairment charges only after the Spruce Point report was published.  Cyprus, Mason, and Phillips failed to ensure the integrity of the Company's internal controls, allowing the misleading statements to be disseminated in the Company's SEC filings and other disclosures.  Thus, Cyprus, Mason, and Phillips breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Cyprus, Isham, and Kehler**

163.     Cyprus, Isham, and Kehler served as members of the Company's Risk Committee. As such, they are responsible for identifying and mitigating risks that the Company faces and periodically reviewing the adequacy of Maxar's risk management responsibilities.  As alleged herein, the GeoComm business was underperforming, dragging the performance of Maxar's other segments such that the Company faced a significant risk of defaulting on its debt.  Cyprus, Isham, and Kehler failed to mitigate these risks, and Maxar was forced to amend its credit agreements. Thus, Cyprus, Isham, and Kehler breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Estes, Cyprus, and Mason**

164.     Estes, Cyprus, and Mason were directors of DigitalGlobe, which was acquired by Maxar in October 2017.  WorldView-4 is DigitalGlobe's flagship satellite, and Estes, Cyprus, and Mason knew of the significance of the TLE data and of telemetry.  Thus, they knew or should have known that WorldView-4 could no longer produce high quality imaging as of October 2018, but

Estes, Cyprus, and Mason caused the Company to issue materially misleading statements about its operation.  As a result, Estes, Cyprus, and Mason would be interested in a demand regarding their own wrongdoing, and demand is futile as to them.

**Defendant Jablonsky**

165.    Jablonsky was President of DigitalGlobe after its acquisition by Maxar until January 2019.  WorldView-4 is DigitalGlobe's flagship satellite, and Jablonsky knew of the significance of the TLE data and of telemetry.  As President of DigitalGlobe, he would have known when WorldView-4 could no longer produce high quality imaging, but he caused the Company to issue materially misleading statements about its operation.   As a result, Jablonsky would be interested in a demand regarding their own wrongdoing, and demand is futile as to them.

<u>**COUNT I**</u>

**Against All Defendants for Breach of Fiduciary Duty**

166.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Maxar's business and affairs, particularly with respect to issues as fundamental as public disclosures.

168.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Maxar.

169.    In breach of their fiduciary duties owed to Maxar, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

170.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

171.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Maxar has sustained and continues to sustain significant damages.  Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against the Director Defendants for Gross Mismanagement

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173.    By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a  publicly held corporation.

174.    As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

175.    Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## COUNT III
### (Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Individual Defendants)

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    This Count is asserted on behalf of the Company against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

178.    Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the misleading disclosures, which were intended to, and did deceive the Company: (i) that the AMOS-8 contract "was not a definitive award" because (a) the contract was not effective until SSL received the first payment from Spacecom; (b) Spacecom could withdraw from the deal within 60 days without any penalty; (c) Spacecom was entirely reliant on future bond offerings to fund AMOS-8; (ii) that the GeoComm CGU was impaired; (iii) that, due to the Spruce Capital report, Maxar's Audit Committee launched an investigation into the alleged accounting errors and would be assisted by the Company's new certified public accountants and "independent" third-party consultants; (iv) that WorldView-4 had lost stability beginning no later than October 12, 2018; and (v) that it was no longer a fully-functioning satellite capable of supplying high-resolution imagery to customers on demand.

179.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that he (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the misleading disclosures.

180.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Maxar, their control over, and/or receipt and/or modification of Maxar's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Maxar, participated in the fraudulent scheme alleged herein.

181.    As a result of Defendants' misconduct, Maxar the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

182.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT IV
### (Derivative Claim for Violations of Section 20(a) of the Exchange Act Against Defendants Lance and Wirasekara)

183.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.    This Count is asserted on behalf of the Company against Defendants Reilly and Frankola for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

185.    During their tenure as executive officers, Defendants Lance and Wirasekara were controlling persons within the meaning of Section 20(a) of the Exchange Act.  By reason of their absolute control, Defendants Lance and Wirasekara had the power and authority to direct the management and activities of the other executive employees, to hire and fire other executive employees at whim, and to cause other executive employees to engage in the wrongful conduct complained of herein.  Defendants Lance and Wirasekara were able to and did control, directly or indirectly, the content of the public statements made by all other executive employees at all relevant times, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

186.    In their capacity as the senior executives, Defendants Lance and Wirasekara had direct involvement in and oversight over the day-to-day operations of the executive employees and the Company's employees, who would not act unless Defendants Lance and Wirasekara agreed with their course of conduct.

187.    As set forth above, Defendants Lance and Wirasekara violated Section 10(b) of the Exchange Act by his acts and omissions as alleged herein.  To the extent Defendants Lance and Wirasekara are not the makers or disseminators of a specific false or misleading statement made

by the Company, Defendants Lance and Wirasekara are liable pursuant to Section 20(a) of the Exchange Act.

188.    As a direct and proximate result of their conduct, the Company suffered damages in connection with its misleading disclosures.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Maxar, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Maxar and that plaintiff is an adequate representative of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Maxar;

D.    Directing Maxar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Maxar and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a proposal to strengthen Maxar's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Maxar to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Maxar has an effective remedy;

F.      Awarding to Maxar restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: November 14, 2019

Of Counsel:

Matthew M. Houston
Benjamin I. Sachs-Michaels
GLANCY PRONGAY & MURRAY LLP
712 Fifth Avenue
New York, New York 10019
Telephone:  (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

Robert V. Prongay
Lesley F. Portnoy
Pavithra Rajesh
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@famanlaw.com

*Attorneys for Plaintiff Dennis Dorling*

Los Angeles, California 90067
Telephone:  (310) 201-9150
E-mail:  rprongay@glancylaw.com